IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH TELEPHONE NUMBER (304) 784-7861 and SNAPCHAT USERNAMES "sarha0432", "F_Fighter2021", and "rich_flash19" THAT ARE STORED AT PREMISES CONTROLLED BY SNAP INC. | Case No. _____ |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Special Agent Jim Lafferty, being first duly sworn, hereby depose and state as follows:

**I.      INTRODUCTION**

1.      I am a Special Agent with the Federal Bureau of Investigation and have been so employed for approximately nineteen years. I am current assigned to the Charleston, West Virginia, Resident Agency of the Pittsburgh Division. My primary experience as an FBI Special Agent is in investigations relates to complex white-collar crime matters, including public corruption and civil rights matters. Prior to my employment with the FBI, I was employed as a Certified Public Accountant with a public accounting firm for approximately four years. Throughout my law enforcement career, I have received training on the use of social media to perpetrate and further criminal misconduct. In addition, I have worked multiple cases involving the use of on-line activity to enact and further criminal activity.

**II.      PURPOSE OF THE AFFIDAVIT**

2.      I make this affidavit in support of an application for a search warrant for information associated with certain Snapchat usernames that are stored at premises owned, maintained, controlled, or operated by Snap Inc. ("Snap"), a social networking company

headquartered in Santa Monica, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Snap to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the usernames sarha0432, F_Fighter2021, rich_flash19, and telephone number (304) 784-7861.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that CHRISTOPHER OSBORNE has committed violations of 18 U.S.C. § 1512(b)(3) and 18 U.S.C. § 242. There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

III.   **STATUTORY AUTHORITY**

5.     This investigation concerns alleged violations of 18 U.S.C. § 1512(b)(3) and 18 U.S.C. § 242, relating to deprivation of rights under color of law and false statements made to investigating officers.

  a.     18 U.S.C. § 1512(b)(3) prohibits knowingly using intimidation, threatening, or corruptly persuading another person, or attempting to do so, or engaging in misleading conduct toward another person, with intent to hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to te commission or possible commission of a Federal offense.

2

b.      18 U.S.C. § 242 prohibits anyone under the color of law, statute, ordinance, regulation, or custom, from willfully subjecting another person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

## IV.   <u>JURISDICTION</u>

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## V.   <u>BACKGROUND CONCERNING SNAPCHAT</u>[1]

7.      Snap, Inc. ("Snap") the owner of Snapchat, is a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510. Specifically, Snapchat is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Snapchat accounts like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Snapchat users.

8.      Snap collects basic contact and personal identifying information from users during the Snapchat registration process. Snap also collects whether the account phone number has been verified.

---

[1] The information in this section is based on information published by Snap on its website, including, but not limited to, the following document and webpages: "Snap Inc. Law Enforcement Guide," available at https://storage.googleapis.com/snap-inc/privacy/lawenforcement.pdf; and "Snapchat Support," available at https://support.snapchat.com/.

9.     Snap also collects and retains information about how each user accesses and uses Snapchat. This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations. Snap also collects account change history, which Snap describes as a log of changes in registration email or phone number, birthdate, and display name.

10.     Each Snapchat account is identified by a username.

11.     Snapchat offers four primary ways for users to communicate with each other.

a.     **Snaps.** A user takes a photo or video using their camera phone in real-time. The user then selects a time limit of 1-10 seconds for the receiver to view the photo or video. A user can elect to have the photo/video saved in their phone's photo gallery or just sent via Snapchat, without being saved. The photo/video can then be sent to a friend in Snapchat. The snap is deleted after the selected amount of time. If a recipient attempts to take a screenshot of the snap to save on his/her phone, the application will notify the sender of this behavior. Snapchat states that it deletes each snap from its servers once all recipients have viewed it. If a snap has not been viewed by all recipients, Snapchat states that it retains the snap for thirty days.

b.     **Memories.** Memories is Snapchat's cloud-storage service. Users can save their sent or unsent Snaps, posted Stories, and photos and videos from their phone's photo gallery in Memories. A user can also edit and send Snaps and create Stories from these

4

Memories. Snaps, Stories, and other photos and videos saved in Memories are backed up by Snapchat and may remain in Memories until deleted by the user.

     c.     **Stories**. A user can also add the photo/video Snap to their "Story." Depending on the user's privacy settings, the photos and videos added to a Story can be viewed by either all users of Snapchat or just the user's friends for up to 24 hours. Stories can also be saved in Memories.

     d.     **Chat.** A user can also type messages to friends within the Snapchat app using the Chat feature. A user sends a Chat message to a friend, and once it is viewed by both parties – and both parties swipe away from the Chat screen – the message will be cleared. Within the Snapchat app itself, a user can opt to save part of the Chat by tapping on the message (text or photo) that he or she wants to keep. The user can clear the message by tapping it again.

12.     Snapchat also obtains a variety of non-content information from its users.

13.     **Usage Information**. Snapchat may collect information about how users interact with its services, including which search queries they submit, and how they communicate with other users, including maintaining a log of all snaps to and from an account for the last 31 days, for 24 hours of posted Stories, and for any unopened Chats or those saved by a sender or recipient, and how a user interacts with these messages (such as when a user opens a message).

14.     **Device Information**. Snapchat collects information about the devices of its users, including information about the user's hardware and software, such as the hardware model, operating system version, device memory, advertising identifiers, unique application identifiers, apps installed, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones,

and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength. Snapchat can also provide the version of the application that is being used, the "last active" date the application was used, and whether two-factor-authentication is enabled.

15.    **Device Phonebook**.  Snapchat may collect information about the phonebook of the user's device.

16.    **Cameras and Photos**.  Snapchat may collect images and other information from the user's device's camera and photos.

17.    **Location Information**.   Snapchat may collect information about the user's location, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses.

18.    **Snap Map**.  Snapchat allows a user to share location information with his/her friends and also obtain location information about the user's friends. Based on such information, Snapchat places the friends' locations on a map viewable to the user. Snapchat can provide whether Snap Map was enabled.

19.    **Information Collected by Cookies and Other Technologies**.   Snapchat may collect information through cookies and other technologies about the user's activity, browser, and device.

20.    **Log Information**.  Snapchat collects log information when a user uses Snapchat's website, including device information, access times, pages viewed, IP address, and pages visited.

21.    In my training and experience, evidence of who was using the above listed usernames and telephone number and from where, and evidence related to criminal activity of the

kind described in paragraph 5, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

22.     The stored communications and files connected to a Snapchat account may provide direct evidence of the offenses under investigation. Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. In fact, evidence is included in this affidavit detailing the use of instant messages by OSBORNE to effect the criminal activity described in paragraph 5.

23.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Snap can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

24.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

25.     Therefore, Snap's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Snapchat. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## VI.     BACKGROUND OF THE INVESTIGATION AND PROBABLE CAUSE

26.     The Federal Bureau of Investigation ("FBI") and West Virginia State Police ("WVSP") are currently investigating alleged civil rights violations and obstruction offenses committed by CHRISTOPHER OSBORNE, age 25 years old, a former law enforcement officer and former member of the Danville Volunteer Fire Department, located in Boone County, West Virginia.

**VICTIM – K.B. (Juvenile)**

27.     On January 25, 2021, the West Virginia State Police ("WVSP") received information of an alleged sexual assault at the Danville Volunteer Fire Department that had occurred on January 19, 2021. During the course of the investigation the WVSP identified the VICTIM as a sixteen-year old female, K.B. (hereafter, "the VICTIM"), and the accused as OSBORNE.

28.     On January 25, 2021, the VICTIM provided an audio statement to the WVSP.  The VICTIM was interviewed by the FBI at later dates. The VICTIM provided the following information. On January 19, 2021, the VICTIM was asked by her friend, M.H., to travel with her to the Danville Volunteer Fire Department. OSBORNE had used two Snapchat vanity/display names to communicate with the VICTIM: "Richard Smith" and a name using the word

8

"firefighter." Once they arrived at the fire department, M.H. asked the VICTIM to walk upstairs with her to the television room. It was there where the VICTIM first met OSBORNE.

29.     The VICTIM stated she did not want to have sex with OSBORNE. The VICTIM was aware from others that OSBORNE used the Danville Fire Department to have sex with females. Knowing this information, the VICTIM asked M.H. not to leave her alone with OSBORNE. After a period of time, however, M.H. left the room, informing the VICTIM that she was going to go use the restroom. After M.H. left the television room, OSBORNE grabbed the VICTIM by the arm and walked her out of the television room and down the hall to the bunk room. OSBORNE walked the VICTIM into the room and then pushed the VICTIM onto one of the beds.

30.     According to the VICTIM, OSBORNE removed some of her clothing, penetrated her vagina with his penis, and performed oral sex on the VICTIM without the VICTIM's consent. The VICTIM told OSBORNE that she did not want to have sex with him and to stop. The VICTIM could not push OSBORNE off of her because of his strength and weight. The VICTIM had with her a kubotan (a self-defense keychain weapon) and pepper spray that she carried to defend herself. When OSBORNE saw the VICTIM trying to get access to her pepper spray, OSBORNE threw the pepper spray and some other items she was carrying away from the VICTIM. OSBORNE pulled the shirt of the VICTIM up to her neck area and used the shirt to choke the victim and his hands on her shoulders to hold the VICTIM down, causing the VICTIM pain.

31.     After OSBORNE ejaculated, OSBORNE and the VICTIM both got dressed and, after gathering their things from the television room, went downstairs. There, the VICTIM encountered C.K., who she talked to before leaving the Danville Volunteer Fire Department with M.H. The VICTIM changed her clothes once she got home and did not wash the shorts she was wearing under her sweatpants.

32.     According to both the VICTIM and C.K., the following day, the VICTIM notified C.K. that OSBORNE had raped her.

33.     On January 25, 2021, the VICTIM provided the WVSP with the shorts she was wearing the night of the alleged rape. The shorts were placed into temporary evidence. On January 25, 2021, the WVSP reviewed surveillance footage obtained from the Danville Volunteer Fire Department. The surveillance footage shows the following: the VICTIM and M.H. (discussed below) enter the upstairs portion of the Danville Volunteer Fire Department at 1601 hours on January 19, 2021. At 1613 hours, M.H. exits the television room and walks through the door leading downstairs. At 1616 hours, OSBORNE and the VICTIM exit the television room and walk down the hall toward the bunk room. OSBORNE escorts the VICTIM with his hand placed on the VICTIM's back. OSBORNE opens the door to the bunk room and the VICTIM appears to lean back away from the door as OSBORNE appears to place his hand the VICTIM's back and lead her into the bunkroom. OSBORNE and the VICTIM exit the bunkroom approximately 45 minutes later at approximately 1701 hours.

34.     On January 26, 2021, the WVSP conducted an audio-recorded, non-custodial interview with OSBORNE. OSBORNE repeatedly stated that he did not have any sexual contact with the VICTIM on the day of the incident. Specifically, OSBORNE denied having sex with, fondling, digitally penetrating, or having any other sexual contact with the VICTIM. OSBORNE advised it was intention to have sex with the VICTIM but that it did not happen. OSBORNE admitted to kissing the VICTIM but stated that they spent the rest of their time together talking. OSBORNE denied having sex with and/or sexually assaulting the VICTIM at least eight times during the interview. OSBORNE admitted to using Snapchat to communicate with the VICTIM but told the WVSP that the VICTIM had blocked him on the application and their messages were

10

Case 2:21-mj-00160   Document 3-1   Filed 09/02/21   Page 11 of 25 PageID #: 21

no longer available to him. OSBORNE also denied being aware of any other sexual assault allegations against him.

35.     On January 26, 2021, the WVSP transported the VICTIM's shorts to the WVSP Laboratory for testing. On February 2, 2021, the WVSP obtained a search warrant for OSBORNE's DNA from the Boone County Circuit Court. On February 3, 2021, the WVSP received a copy of the WVSP Laboratory report advising a sample from the blue shorts tested positive for spermatozoa. On February 3, 2021, the WVSP collected two swabs of DNA from the inner portion of OSBORNE's cheek. On this same date, the two DNA swabs were placed into temporary evidence at the WVSP Madison Detachment. On February 8, 2021, the DNA swabs for OSBORNE and the VICTIM were transported to the WVSP laboratory for testing. On February 26, 2021, the WVSP received the WVSP Laboratory Report related to the two DNA swabs. The report stated that results obtained from a section of the shorts indicated a mixture of DNA from two contributors, OSBORNE and the VICTIM.

**STATEMENTS MADE BY M.H.**

36.     On January 26, 2021, M.H., a 17-year-old juvenile female, was interviewed by the WVSP and on July 30, 2021, M.H. was interviewed by the FBI. M.H. said that she met OSBORNE in approximately June 2020 through her work as a junior firefighter at the Danville Volunteer Fire Department.

37.     M.H. said that she and OSBORNE communicated through Snapchat. M.H. stated that OSBORNE had up to five different Snapchat accounts. M.H. believed that OSBORNE had so many Snapchat accounts because his girlfriend would catch him communicating with other girls using different accounts, which would lead to OSBORNE opening up a new account. M.H. could recall OSBORNE having Snapchat account with usernames or display/vanity names including the

11

words: Blue Piggy (the first Snapchat account OSBORNE used to communicate with M.H.), Richard Smith, and Firefighter.

38.     OSBORNE frequently messaged M.H. using Snapchat to ask her to connect him with her friends for sex. M.H. described OSBORNE as being very persistent and someone who is hard to tell no. M.H. said that OSBORNE pressured M.H. to bring three different teenage girls to him at the fire department, including the VICTIM, so that he could have sex with them. M.H. did so on multiple occasions. On one such occasion, M.H.'s friend, J.M., told M.H. that she did not want to have sex with OSBORNE.  M.H. brought J.M. to the Danville Volunteer Fire Department. M.H. saw OSBORNE grab J.M. by the arm and lead her upstairs. J.M. later told M.H. that she had not wanted to have sex with OSBORNE but did so and did not like the encounter. The third teenage girl told M.H. that she had consensual sex with OSBORNE at the fire department. OSBORNE communicated with the other two females using Snapchat. M.H. stated that she gave in to OSBORNE's demands in part because it was important to her to succeed as a junior firefighter and to be accepted by OSBORNE and other firefighters.

39.     M.H. stated that on one occasion, OSBORNE used Snapchat to ask her to come to the fire department so that they could hang out. Once she arrived at the fire department, OSBORNE and M.H. met in the television room. OSBORNE asked M.H. to sit next to her. OSBORNE put his arm around M.H and told her that she needed to loosen up. OSBORNE then put his hand on M.H.'s thigh. At that time, M.H. told OSBORNE that she was not interested and left the room.

40.     M.H. also told investigators about K.B.'s interactions with OSBORNE. At a memorial service for a deceased Emergency Medical Technician, RICHARD SMITH, M.H. received a message on Snapchat from OSBORNE. OSBORNE was using for his Snapchat username or vanity/display name the name of the deceased, Richard Smith. OSBORNE stated in

the message that he wanted to "fuck" the VICTIM. The VICTIM was with M.H. at the memorial service. According to M.H., the VICTIM knew who OSBORNE was at that time.  M.H. and other females had discussed with the VICTIM how OSBORNE was a "player." Shortly thereafter, the VICTIM and OSBORNE added each other on Snapchat. At no point did the VICTIM tell M.H. that she wanted to have sex with OSBORNE.

41.     On January 19, 2021, OSBORNE asked M.H. to bring the VICTIM to the Danville Volunteer Fire Department. Initially, the VICTIM did not want to go to the Fire Department, but she eventually went with M.H.  M.H. and the VICTIM went upstairs to the television room, where OSBORNE was located. M.H. received messages via Snapchat from OSBORNE while sitting in the television room. OSBORNE told M.H. to leave so that he could be alone with the VICTIM. Eventually, M.H. agreed and left, saying that she needed to use the restroom. M.H. went downstairs until OSBORNE and the VICTIM returned.

**OTHER USES OF SNAPCHAT BY OSBORNE**

42.     On May 12, 2021, K.L, OSBORNE's former fiancée, was interviewed by the FBI. K.L. was aware of at least three Snapchat accounts OSBORNE used from 2019 through at least early 2021: sarha0432 (vanity/display name: Sarah Holten), F_Fighter2021, and rich_flash19 (vanity/display name: Richard Smith). K.L. showed the FBI images on her cellular phone from the Snapchat app showing a username "f_fighter2021" with a vanity/display name of "Chris Osborne." K.L. also showed the FBI saved Snapchat chat images showing "selfies" of OSBORNE in a police hat sent from the username "sarha0432" with a vanity/display name "Sarah Holton."

43.     K.L. advised OSBORNE used the sarha0432 username to communicate with her. OSBORNE sent K.L. a picture of his police badge before sending her a selfie of himself. OSBORNE told K.L. the rich_flash19 Snapchat account belonged to his cousin. OSBORNE also

used an account that included the name Blue Piggy. OSBORNE told K.L. that he used this name because "pig" was a slang word for a police officer.

44.     K.L. has described the type of phone OSBORNE was using in or around January 2021 as an iPhone, telephone number (304) 784-7861. K.L. confirmed that OSBORNE used to have a different cellular telephone number but changed it in or around the summer of 2020. Telephone number (304) 784-7861 is a number provided by AT&T Wireless.

45.     On May 12, 2021, during an interview with the FBI, J.M., described above, advised that she first communicated with OSBORNE via M.H.'s Snapchat account. Later, J.M. and OSBORNE communicated directly through their own Snapchat accounts. J.M. could not specifically recall OSBORNE's Snapchat username but thought the name may have included "Blue Piggy." J.M. also confirmed the account M.H. has provided of her (J.M.'s) encounter with OSBORNE at the Danville Volunteer Fire Department.

46.     On May 12, 2021, C.A., a female, advised that approximately two years ago OSBORNE attempted to get C.A. to set him up with her young female coworkers. OSBORNE wanted C.A. to provide him with the Snapchat usernames for her friends. C.A. told OSBORNE the girls he was asking about were underage and still in high school. OSBORNE did not care and still wanted their information. C.A. did not tell the underage girls of OSBORNE's interest and instead told OSBORNE that the girls were not interested in him.

47.     C.A. advised that OSBORNE used fake Snapchat accounts. C.A. could recall the Snapchat account OSBORNE used included the word "Flash." C.A. could also recall OSBORNE using an account with the word Firefighter and a number in the username or display/vanity name.

48.     Your affiant believes the F_Fighter2021 username and rich_flash19 username identified by K.L. to be the same Snapchat usernames identified by the VICTIM, M.H., and C.A.

14

**INFORMATION PROVIDED BY SNAP, INC.**

49.    A preservation request was sent to Snap, Inc. on February 12, 2021, requesting that records for f_fighter2021 and telephone number (304) 928-8638 be preserved. A preservation request was sent to Snap on May 17, 2021, requesting that records for f_fighter2021, sarha0432, rich_flash19, and telephone number (304) 928-8638 be preserved. On July 8, 2021, a federal grand jury subpoena was sent to Snap requesting records related to f_fighter2021, sarha0432, rich_flash19, and telephone number (304) 928-8638.

50.    Records from Snap for sarha0432 lists the account as currently active and was opened on February 9, 2019, with a listed email address of sarhaht1@gmail.com and the display name, Sarah Holton. No telephone number was listed.

51.    Records from Snap for rich_flash19 lists the account as currently active and was opened on May 12, 2019, with a listed email address of richflash@gmail.com and the display name, Richard Smith.

52.    Records from Snap for f_fighter2021 lists the account as currently active and was opened on January 8, 2021, with a listed email address of chrisosborne822@yahoo.com, telephone number (304) 784-8658, and the display name, Chris Osborne.

53.    A review of log-in/log-out information for the rich_flash19 and f_fighter2021 accounts on January 19, 2021, the date of the alleged rape of the VICTIM, revealed the following:

a.    At 5:19:18 UTC the f_fighter2021 account was logged out of from an IP address associated with AT&T Wireless.  (See paragraph 49 – OSBORNE's known telephone number at this time, 304-784-7861, was provided by AT&T Wireless)

b.    At 5:19:33 UTC the rich_flash19 account was logged in to from the same IP address associated with AT&T Wireless.

c.     At 5:31:08 UTC the rich_flash19 account was logged out of from an IP address associated with Suddenlink.

d.     At 5:31:12 UTC the f_fighter2021 account was logged in to from the same IP address associated with Suddenlink.

16

VII.   **CONCLUSION**

54.    Based on the foregoing, there is probable cause to believe that the federal criminal statutes cited herein have been violated, and that evidence of those violations may be located in the information described in attachment A.

55.    Based on the foregoing, I request that the Court issue the proposed search warrant.

56.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Snap Inc. Because the warrant will be served on Snap Inc., who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

57.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

SPECIAL AGENT JAMES LAFFERTY
FEDERAL BUREAU OF INVESTIGATION

Shown and subscribed before me this __2nd__ day of ~~July,~~ September, 2021.

Omar J. Aboulhosn
United States Magistrate Judge

17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Snapchat usernames "sarha0432" "F_Fighter2021", "rich_flash19", and telephone number (304) 784-7861, from June 1, 2020 to the present, that is stored at premises owned, maintained, controlled, or operated by Snap Inc., a company headquartered in Santa Monica, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.**  **Information to be disclosed by Snap Inc. ("Snap")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Snap, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Snap, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on February 12, 2021, and May 17, 2021, Snap is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      all records or other information pertaining to the **Subject Accounts and telephone number**, including all files, databases, and database records stored by Snap in relation to those accounts and that telephone number;

b.      all information in the possession of Snap that might identify the subscribers related to this account or identifiers, including names, dates of birth, addresses, telephone numbers, email addresses, account creation date, the length of service (including start date), types of services utilized, timestamps and IP address for account logins/logouts, and means and source of payment for services (including any credit card or bank account number), account change history, which Snap describes as a log of changes to the account made by the user, including dates/times of changes in registration email or phone number, birthdate, and display name, whether two-factor-authentication was enabled, and whether the account phone number has been verified;

c.      all usage information for the **Subject Accounts and telephone number**, including search queries submitted and information about how the user of the **Subject Accounts and telephone number** communicates with other users and the "last active" date for each Account;

1

d.      logs, including sender, recipient, date, time, message type, message status (including if and when the message was opened), and whether the receiver used the native screen capture function of their device, concerning communications, including Snaps, Stories, Chats, or Memories sent to or from the **Subject Accounts and telephone number**, and log information when the user of the **Subject Accounts and telephone number** uses Snap's website, including device information, access times, pages viewed, IP address, and pages visited;

e.      all information about which users of **Subject Accounts and telephone number** communicate with the most;

f.      device information such as the device memory, advertising identifiers, unique application identifiers, apps installed, version numbers of the Snapchat app installed and date of each installation, unique device identifiers, browser type, language, battery level, and time zone; information from device sensors, such as accelerometers, gyroscopes, compasses, microphones, and whether the user has headphones connected; and information about the user's wireless and mobile network connections, such as mobile phone number, service provider, and signal strength of devices used by **Subject Accounts and telephone number** in conjunction with the service;

g.      information obtained from the devices used by the **Subject Accounts and telephone number**, including the device's phonebook, cameras, and photos;

h.      location information about **Subject Accounts and telephone number**, including precise location using methods that include GPS, wireless networks, cell towers, Wi-Fi access points, and other device sensors, such as gyroscopes, accelerometers, and compasses, as well as location information obtained using the Snap Map feature, and whether Snap Map has been enabled;

2

i.      receipts for any transactions conducted by **Subject Accounts and telephone number**;

j.      list of all "friends" of the users of the **Subject Accounts and telephone number**, changes to these lists, and dates of any changes;

k.      all users listed in the "Quick Add" feature for the users of the **Subject Accounts and telephone number**;

l.      all information and records relating to "friend suggestions" made to the users of the **Subject Accounts and telephone number**; and

m.      content of all communications, including Snaps, Memories, Stories, or Chats, sent or received by **Subject Accounts and telephone number**.


Snap is hereby ordered to disclose the above information to the government within **14 days** of issuance of this warrant.

## II.  Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of Titles 18 U.S.C. § 1512(b)(3) and 18 U.S.C. § 242, those violations involving **CHRISTOPHER OSBORNE** and occurring after June 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

(a) Communication between OSBORNE and others that might include preparatory steps taken in furtherance of the violations listed above and/or communication that would be considered the grooming of other Snapchat users.

(b) Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

(c) Evidence indicating the email account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

(e) **The identity of the person(s) who communicated with the Subject accounts and telephone number that contain evidence of the above listed violations, including preparatory steps taken in furtherance of the violations listed above and/or communication that could be considered the grooming of other Snapchat users**, including records that help reveal their whereabouts.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits,

4

and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC

## RECORDS PURSUANT TO FEDERAL RULES OF

## EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Snap Inc. ("Snap"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Snap. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Snap, and they were made by Snap as a regular practice; and

b.      such records were generated by Snap's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Snap in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Snap, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                     Signature